# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 4, 2013 Session

## PHILIP DOOLY ET AL. v. TENNESSEE STATE BOARD OF EQUALIZATION ET AL.

### Appeal from the Chancery Court for Polk County
### Nos. 7381 & 7401     Jerri S. Bryant, Chancellor

### No. E2012-01022-COA-R3-CV-FILED-APRIL 29, 2013

The petitioners are holders of special use permits issued by the federal government allowing them to own and use for non-commercial recreational purposes certain improvements on federally-owned national forest land. The Polk County tax assessor valued and assessed the petitioners' interests in the properties as leasehold interests. The Petitioners brought this action challenging their real estate tax assessments. The issues presented include whether the appraisal methodology used in valuing the petitioners' leasehold interests violated the governing leasehold valuation statute, Tennessee Code Annotated § 67-5-605, and whether the petitioners should receive an offsetting tax credit for monies allegedly paid by the federal government to Polk County pursuant to 16 U.S.C. § 500. We affirm the judgment of the trial court holding that the appraisal methodology violated the statute by arbitrarily applying a static 99-year term when the express term of the special use permits was less than seven years during the tax years in question, 2003 through 2008. We reverse the trial court's judgment ordering the tax assessor to allow an offsetting credit because the petitioners have cited no legal authority requiring or permitting such a result. The case is remanded with instructions to the Polk County Tax Assessor to reassess the petitioners' leasehold interests for the years 2003 through 2008 in a manner consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

James F. Logan, Jr. and Matthew G. Coleman, Cleveland, Tennessee, for the appellants, Polk County Tax Assessor and Polk County Trustee.

David M. Elliott, Chattanooga, Tennessee, for the appellees, Philip Dooly, John Higgins, Maryl Elliott, Anne Longley, Robert Robbins, Philip Newman, Amy Card-Lillios, Tommie Davis, Doug Swayne, David Hairrell, Alice Hairrell, Kelly Feehrer, Michael Callaway, David Turpin, Burton Hall, George Lessig, Larry McDaris, William Torbett, Neal Officer, Karen Fisher, and Richard Fisher.

## OPINION

### I. Factual and Procedural Background

This appeal involves the taxation of certain parcels of real estate (collectively "the Properties") located in the Cherokee National Forest on the shores of Parksville Lake, also referred to as Lake Ocoee, in Polk County. The Properties are owned in fee simple by the United States Department of Agriculture and managed by the United States Forest Service. The Forest Service issued "Term Special Use Permits" authorizing the permit holders "to use National Forest lands for a recreation residence for personal recreational use" subject to the permit's terms and provisions. The permit holders own cabins and other improvements on the lakeshore lots and use them for part-time recreational residences. They pay the Forest Service an annual Term Special Use Permit fee for this privilege.

Prior to 2003, Polk County assessed taxes only on the permit holders' improvements located on the subject parcels.[1] In 2003, a year of county-wide reappraisal and reassessment, Polk County's tax assessor determined that real estate taxes should also be assessed on the interest that the permit holders possessed in the Properties, asserting that it was equivalent to a leasehold interest. After receiving notice of tax assessment on their "leasehold" interests, nineteen permit holders—Philip Dooly, John Higgins, Maryl Elliott, Anne Longley, Robert Robbins, Philip Newman, Amy Card-Lillios, Tommie Davis, Doug Swayne, David and Alice Hairrell, Kelly Feehrer, Michael Callaway, David Turpin, Burton Hall, George Lessig, Larry McDaris, William Torbett, Karen and Richard Fisher, and Neal Officer (collectively "Petitioners")—appealed the assessor's determination to the Polk County Board of Equalization. Petitioners argued that their respective interests did not constitute a taxable leasehold interest, and in the alternative, that the appraisal and assessment method used by the assessor was improper and violated the governing statute, Tennessee Code Annotated § 67-5-605. Petitioners further claimed that they should be given an offsetting credit for the amount that the U.S. Department of Agriculture allegedly paid Polk County under the 25% Fund Act of May 23, 1908, codified at 16 U.S.C. § 500, an amount believed to equal 25%

---

[1]Petitioners have not challenged Polk County's valuation and assessment of the improvements erected on the Properties.

of the Term Special Use Permit fees paid by the permit holders.[2] Unsuccessful at the county level, Petitioners appealed to the State Board of Equalization. On December 22, 2003, the Administrative Law Judge ("ALJ") held that the Petitioners' interests in holding their Term Special Use Permits were an interest in real property similar to a lease and taxable as a leasehold interest.[3] This decision was affirmed on interlocutory appeal to the Assessment Appeals Commission of the State Board of Equalization.[4]

Thereafter, on October 18, 2005, the ALJ held a hearing at which the parties presented extensive proof regarding the Properties and the Petitioners' improvements thereon, and the methodology employed by the assessor, aided by the State Division of Property Assessment ("DPA"), to establish the value of the leasehold interests. The ALJ issued an order on January 24, 2006, upholding the appraisal assessments and determining that the valuation methodologies used by the Polk County Assessor and the DPA were proper and in compliance with state statutory requirements. Petitioners appealed to the Assessment Appeals Commission, which affirmed and upheld the ALJ's decision. In March and September of 2008, the Board of Equalization issued official certificates of the Assessment Appeals Commission to the Petitioners, the final action of the administrative appeals process.

Petitioners subsequently filed a petition for judicial review and declaratory judgment with the Chancery Court for Polk County[5] pursuant to Tennessee Code Annotated § 67-5-1511. This statute provides, *inter alia*, that "[t]he action of the state board of equalization

---

[2]16 U.S.C. § 500 provides in pertinent part:

On and after May 23, 1908, an amount equal to the annual average of 25 percent of all amounts received for the applicable fiscal year and each of the preceding 6 fiscal years from each national forest shall be paid, at the end of such year, by the Secretary of the Treasury to the State or Territory in which such national forest is situated, to be expended as the State or Territorial legislature may prescribe for the benefit of the public schools and public roads of the county or counties in which such national forest is situated[.]

[3]The parties and trial court have routinely referred to the Petitioners' interests under the Term Special Use Permit as "leasehold interests." For consistency and ease of reference, we will similarly refer to the interests as "leasehold interests" in this opinion, although it should be noted that they are technically not leaseholds because there is no lease, but rather an interest analogous to a leasehold interest for taxation purposes.

[4]Petitioners have not challenged the classification of their permit interests as taxable leasehold interests in their appellate brief and argument before this court.

[5]Two of the permit holders, Neal Officer and Richard and Karen Fisher, initially filed a separate petition from the other Petitioners. The petition was later consolidated into this single action by order of the trial court.

shall be final and conclusive as to all matters passed upon by the board, subject to judicial review," which "shall consist of a new hearing in the chancery court based upon the administrative record and any additional or supplemental evidence which either party wishes to adduce relevant to any issue." The trial court conducted a hearing on February 11, 2011. After considering the additional evidence presented at the hearing and reviewing the administrative record, the trial court entered its order on July 21, 2011, containing the following pertinent findings of fact and conclusions of law:

> The Forest Service has issued to each of the [Petitioners] "a term use special permit" (permit) that authorizes non-commercial recreational use of the designated lots for a twenty (20) year period ending December 31, 2008. . . . Use of any site as a permanent residence is expressly prohibited. The permit is not transferable. It automatically terminates upon a voluntary sale of the improvements on the site. However, the new purchaser "will be granted a new permit" by the Forest Service for the remainder of the original term if that person is "deemed by the authorizing officer to be qualified as a holder."
> . . . .
> Under TCA § 67-5-502, Polk County valued the leasehold interest by a method using sales or transfers of similar interests in residential property. This method, while now authorized under an amended TCA § 67-5-605, was not an allowable method under the statute in effect at the time of the valuation of the leasehold interest. Under the former TCA § 67-5-605, Polk County was to value the leasehold interest by "discounting to present value the excess, if any, of fair market rent over actual and imputed rent for the leased premises, for the projected term of the lease including renewal options." . . . They did not. The State Board of Equalization after an administrative hearing found the actions of Polk County acceptable.
> . . . .
> Petitioners raise several issues in connection with Polk County's appraisal and the assessment. [The] Polk County Tax Assessor used a term of ninety-nine (99) years in his appraisal and assessment. None of the permits have a term of ninety-nine (99) years. Petitioners contend the use of a term different from the actual permit term violates TCA § 67-5-605. They further contend the sales data used is arbitrary.
> In this case the Division of Property Assessments (DPA) calculated a value for the leasehold interests. Based on a lack of comparable rentals of residential properties, DPA used the <u>sales</u> data of comparable cabins to determine the fair market value of the <u>leaseholds</u> of the subject properties. DPA deemed the value of the right to use and occupy a subject lot to be the remainder of subtracting the value assigned to the existing improvements for

-4-

each sales price. Even though the permits issued to the Petitioners by the Forest Service were for a twenty (20) year period ending December 31, 2008, DPA chose to use a ninety-nine (99) year projected term in its calculations. . . .

While several administrative opinions in this case have described the methodology used by the State of Tennessee in arriving at values for this property, it is clear that the methodology used did not follow the statute. This case boils down to the question of whether the methodology used by the Division of Property Assessments for the benefit of Polk County, Tennessee was arbitrary and capricious or followed an unlawful procedure; and, further, whether or not the failure to give the taxpayers credit for the twenty-five (25%) percent amount of tax that was paid by the Federal Government to Polk County was likewise arbitrary and capricious. It is admitted by the parties that after 2008 the statute was amended to allow the methodology used for these years prior to 2008.

. . . .

[T]he court finds that the lease term is arbitrary. The court further finds that Polk County did not follow the statutory directive. Since there is not a guaranteed renewal, the assessment should adjust each year based on the permit term to begin again at the renewal of each permit. . . . Polk County further failed to: "discount to present value the excess, if any, of the fair market rent over actual and imputed rent for the leased premises for the projected term of the lease including renewal options." [Tenn. Code Ann. § 67-5-605].

Based on the above, this court finds Polk County's actions prejudiced the taxpayers by failing to follow the statute, using an unlawful procedure, and the methodology used is not supported by the evidence. The assessments were erroneous and in violation of TCA § 67-5-605. Polk County willfully disregarded the true lease term and imputed a "reasonable probability" of its renewal. It therefore acted arbitrarily and capriciously, and these actions are set aside.

The trial court ordered that the Polk County Tax Assessor void the taxes and reassess the property according to Tennessee Code Annotated § 67-5-605, "and allow a credit for the portion of the permit fee paid [by] the U.S. Government to Polk County."

## II. Issues Presented

The Polk County Tax Assessor and Trustee appeal, presenting the following issues:

(1) whether the trial court erred in holding that the appraisal methodology used in valuing the Petitioners' leasehold interests and the resulting tax assessments violated the governing leasehold valuation statute, Tennessee Code Annotated § 67-5-605;

(2) whether the trial court erred in ordering the tax assessor to allow a credit for the amount paid by the federal government to Polk County under 16 U.S.C. § 500, which requires the federal government to pay "an amount equal to the annual average of 25 percent of all amounts received . . . from each national forest."

### III. Standard of Review

Judicial review of a decision of the State Board of Equalization is governed by the Uniform Administrative Procedures Act and "'the narrow, statutorily defined standard contained in [T.C.A.] § 4–5–322(h) rather than the broad standard of review used in other civil appeals.'" *Willamette Indus., Inc. v. Tenn. Assessment Appeals Comm'n*, 11 S.W.3d 142, 147 (Tenn. Ct. App. 1999) (quoting *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988)). Tennessee Code Annotated § 4-5-322(h) provides that a reviewing court

> may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
> (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

The standard of review of an administrative agency's decision following a contested proceeding is the same in the appellate court and the chancery court. *Terminix Int'l Co., L.P. v. Tenn. Dept. of Labor*, 77 S.W.3d 185, 191 (Tenn. Ct. App. 2001). Questions of fact are thus reviewed upon a standard of substantial and material evidence. Tenn. Code Ann. § 4-5-322(h)(5)(A); *Wamp v. Tenn. State Bd. of Architectural & Eng'g Exam'rs*, 868 S.W.2d 273, 274 (Tenn. 1993). "'[M]aterial evidence' is relevant evidence that a reasonable person

would accept as adequate to support a rational conclusion. The amount of material evidence required to support a board's or agency's decision must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Leonard Plating Co. v. Metro. Gov't of Nashville & Davidson Cnty.*, 213 S.W.3d 898, 904 (Tenn. Ct. App. 2006) (citations omitted). As this court observed in *Willamette,*

> Stated another way, "[a]n agency's factual determination should be upheld if there exists 'such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.'"

11 S.W.3d at 147 (quoting *Wayne Cnty.*, 756 S.W.2d at 279).

Moreover, "[g]enerally speaking, courts will 'defer to decisions of administrative agencies when they are acting within their area of specialized knowledge, experience, and expertise.' . . . As further explained in *Wayne County*,

> [t]he general rules governing judicial review of an agency's factual decisions apply with even greater force when the issues require scientific or technical proof. Appellate courts have neither the expertise nor the resources to evaluate complex scientific issues de novo. When very technical areas of expertise are involved, they generally defer to agency decisions, and will not substitute their judgment for that of the agency on highly technical matters.
> However, the court's deference to an agency's expertise is no excuse for judicial inertia. Even in cases involving scientific or technical evidence, the "substantial and material evidence standard" in [T.C.A.] § 4-5-322(h)(5) requires a searching and careful inquiry that subjects the agency's decision to close scrutiny."

*Willamette*, 11 S.W.3d at 147 (quoting *Wayne Cnty.*, 756 S.W.2d at 280).

When the resolution of an issue presented on review of an administrative decision hinges upon the interpretation of a statute, our standard of review is de novo, with no presumption of correctness of the administrative agency's statutory interpretation. *H & R Block E. Tax Servs., Inc. v. Tenn. Dept. of Commerce & Ins.*, 267 S.W.3d 848, 855 (Tenn. Ct. App. 2008); *Spring Hill, L.P. v. Tenn. Bd. of Equalization*, No. M2001-02683-COA-R3-CV, 2003 WL 23099679, at *5 (Tenn. Ct. App. Dec. 31, 2003).

Tax assessments are generally presumed to be valid, and "'the burden is on the taxpayer to prove that they are erroneous.'" *Edmondson Mgmt. Serv., Inc. v. Woods*, 603

S.W.2d 716, 717 (Tenn. 1980) (quoting *Howard v. United States*, 566 S.W.2d 521, 528 (Tenn. 1978)).  However, "[t]axation statutes must be liberally construed in favor of the taxpayer and strictly construed against the taxing authority." *Covington Pike Toyota, Inc. v. Cardwell*, 829 S.W.2d 132, 135 (Tenn. 1992); *Moto-Pep, Inc. v. McGoldrick*, 303 S.W.2d 326, 330 (Tenn 1957) (observing that any "doubt must be resolved in favor of the taxpayer").[6]

## IV. Appraisal Methodology of Leasehold Interest Under
## Tennessee Code Annotated § 67-5-605

The primary issue in this appeal is whether the trial court erred in holding that the appraisal methodology used by the Polk County Tax Assessor and state DPA in valuing the Petitioners' leasehold interests, and the resulting tax assessments, violated Tennessee Code Annotated § 67-5-605.  The Tennessee General Assembly has enacted legislation providing for the assessment of leasehold interests at Tennessee Code Annotated § 67-5-502(d), which provides that

> [a]ll mineral interests and all other interests of whatever character, not defined as products of the soil, in real property, including the interest that the lessee may have in and to the improvements erected upon land where the fee, reversion, or remainder therein is exempt to the owner, and which interest or interests is or are owned separately from the general freehold, shall be assessed to the owner thereof, separately from the other interests in such real estate, which other interests shall be assessed to the owner thereof, all of which shall be assessed as real property.

Tennessee Code Annotated § 67-5-605 mandates how leasehold interests are to be valued in Tennessee.  For the relevant period of the tax assessments at issue, specifically 2003 through 2008, Tennessee Code Annotated § 67-5-605 provided that "[l]easehold interests assessable under § 67-5-502 shall be valued by discounting to present value the excess, if any, of fair market rent over actual and imputed rent for the leased premises, for the projected term of the lease, including renewal options."  The statute was later amended to add a provision stating that "[a]s an alternative in valuing an interest in residential property, the interests assessable under § 67-5-502(d) may be valued by the sales comparison approach using sales or transfers of similar interests in residential property." Petitioners have conceded that this provision allows and validates the sales comparison appraisal method used

---

[6]Conversely, tax *exemption* statutes are generally construed in favor of the taxing authority and against the taxpayer. *Covington Pike Toyota*, 829 S.W.2d at 135.

by Polk County to value their leasehold interests after 2008. Petitioners argue that for assessments during the years in question – 2003 through 2008 – the sales comparison method was invalid because it was not allowed by section 67-5-605 as then enacted.

The issue presented requires the construction of a statute, and well-established rules of statutory construction apply. The primary rule governing statutory construction requires us to ascertain and give effect to the legislature's intent as expressed in the statute. *Myers v. AMISUB (SFH), Inc.*, 382 S.W.3d 300, 308 (Tenn. 2012); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808 (Tenn. 2007). To determine legislative intent, we first examine the language of the statute itself, *Curtis v. G.E. Capital Modular Space*, 155 S.W.3d 877, 881 (Tenn. 2005)*,* presuming that "every word in a statute has meaning and purpose" and should "be given effect if the obvious intention of the General Assembly is not violated by so doing." *Lanier v. Rains*, 229 S.W.3d 656, 661 (Tenn. 2007). Courts must "determine legislative intent from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000). "Words employed by the legislature in the enactment of tax statutes are to be taken in their natural and ordinary sense." *Covington Pike Toyota*, 829 S.W.2d at 135.

If the language of the statute under examination is clear and unambiguous, "we apply its plain meaning in its normal and accepted use." *Lanier*, 229 S.W.3d at 661; *see also In re Adoption of A.M.H.*, 215 S.W.3d at 808 ("Where the statutory language is not ambiguous . . . the plain and ordinary meaning of the statute must be given effect."). If the statute is ambiguous, meaning that "the natural and ordinary meaning of the language used may be interpreted to reach contrary results," *In re Adoption of A.M.H.*, 215 S.W.3d at 808, or that "the statute is capable of conveying more than one meaning," *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 309 (Tenn. 2008), then the court may "look beyond the statutory language to determine the legislature's intent." *Walker*, 249 S.W.3d at 309. Furthermore, "[s]tatutes levying taxes will not be extended by implication beyond the clear import of the language used[.]" *Covington Pike Toyota*, 829 S.W.2d at 135.

The Term Special Use Permit issued by the U.S. Forest Service to the Petitioners authorizes holders "to use National Forest lands for a recreation residence for personal recreational use on the Cherokee National Forest, subject to the provisions of this permit." The permit provides that the holder's use must be exercised at least fifteen days per year, but the recreational improvements owned by the holder, typically including a cabin, "shall not be used as a full-time residence to the exclusion of a home elsewhere." By the terms of the permit, "[u]se of the permitted improvements as a principal place of residence is prohibited and shall be grounds for revocation of this permit." The permit expressly "authorizes only personal recreation use of a noncommercial nature by the holder, members of the holder's

immediate family, and guests."

The Forest Service requires permit holders to pay an annual rental fee, which "shall be determined by appraisal and other sound business management principles." The permit, in the "Fee Determination" section, refers to 36 CFR § 251.57(a), which provides that "[t]he fee shall be based on the fair market value of the rights and privileges authorized." According to both 36 CFR § 251.57(a)(3) and the provisions of the Term Special Use Permit, the annual rental fee shall be five percent of the appraised fair market fee simple value of the lot for recreation residence use.

The permit provides that it is non-transferable, except in the case of death of the permit holder, in which case it continues in the name of the surviving spouse if the holder is a married couple, or otherwise passes through the deceased permit holder's estate. The permit further states that

> [i]f the holder through voluntary sale, transfer, enforcement of contract, foreclosure, or other legal proceeding shall cease to be the owner of the physical improvements, this permit shall be terminated. If the person to whom the title to said improvements is deemed by the authorizing officer to be qualified as a holder, then such person to whom title has been transferred will be granted a new permit. Such new permit will be for the remainder of the term of the original holder.

The permit may be revoked by the Forest Service for cause upon breach of the permit's terms and conditions, and also "may be revoked during its term at the discretion of the authorized officer for reasons in the public interest."

All of the permits at issue in this case expressly bore an expiration date of December 31, 2008. Section IX of the permit, captioned "Issuance of a New Permit," provided as follows in relevant part:

> A. Decisions to issue a new permit or convert the permitted area to an alternative use upon termination of this permit require a determination of consistency with the Forest Land and Resource Management Plan (Forest plan).
> 1. Where continued use is consistent with the Forest plan, the authorized officer shall issue a new permit, in accordance with applicable requirements for environmental documentation.
> 2. If, as a result of an amendment or revision of the Forest Plan, the permitted area is within an area allocated to an alternative public use, the authorized

officer shall conduct a site specific project analysis to determine the range and intensity of the alternative public use.

. . . .

b. If the project analysis results in a decision that the lot shall be converted to an alternative public use, the holder shall be notified in writing and given at least 10 years continued occupancy.

The permit further provides that in the event of revocation or notification that a new permit will not be issued following termination, "the holder shall remove within a reasonable time all structures and improvements except those owned by the United States, and shall return the lot to a condition approved by the authorized officer."

Randy Yates, the tax assessor for Polk County, testified that he observed several sales of cabins on Parksville Lake at prices that were significantly above the tax appraisal amounts. Mr. Yates, who had no experience with leasehold interests, contacted the DPA in Knoxville and worked with DPA employees Lynn Tenpenny and Frank Creasman to obtain appraisals and evaluations of the Properties at issue for real estate taxation purposes.[7] They determined that the interests of the permit holders were analogous to, and taxable as, leasehold interests under Tennessee Code Annotated § 67-5-502(d). As the Tennessee Supreme Court has observed, "[t]he valuation of a leasehold for tax purposes . . . is normally accomplished by determining whether there is an excess in fair rental value over the rent reserved in the lease." *Metro. Gov't of Nashville & Davidson Cnty. v. Schatten Cypress Co.*, 530 S.W.2d 277, 281 (Tenn. 1975). Furthermore,

[i]f property is rented for its full value, if it costs the lessee all its worth, then the leasehold has no separate or taxable value. The value of a leasehold is to be based on the difference between the rent paid and the value of the use of the property. In most cases the leasehold is worth nothing, for property is ordinarily rented for the value of its use. There are cases, however, when a leasehold is of real value. The Legislature intended to tax such leaseholds[.]

*State v. Grosvenor*, 258 S.W. 140, 142 (Tenn. 1924).

Mr. Yates testified that he and the other appraisers checked for other leasehold interests in Polk County and, finding none, undertook an appraisal and evaluation of the

---

[7] Donald R. Osborne, the Assistant Director of field operations with the Tennessee DPA, testified by deposition that the function of the DPA is to serve as "an oversight agency that ensures fair and equitable assessments across the state, working in conjunction with local assessors, elected assessors, throughout the entire state."

Properties by examining data of comparable sales of lakeshore properties. Mr. Creasman, a DPA appraisal specialist, testified at the administrative hearing that in evaluating the leasehold interests, "what we did is we took the sale price, subtracted the improvement value and basically what we did is we got a value before expenses." After examining the Properties and recent comparable sales, the appraisers divided the Properties into three categories: (1) lots located on U.S. Highway 64 (valued at $180,000); (2) lots on Sugarloaf Drive or Cookson Creek Road (valued at $164,000); and (3) lots with boat access only (valued at $80,000). The appraisers then estimated the expenses at $2,000 per year and included the "contract rent," *i.e.*, the annual permit fee, and applied a capitalization rate[8] of ten percent, thereby multiplying the estimated yearly expenses by ten to calculate the total expenses over ten years. The appraisers subtracted the total estimated expenses from the sale price, as estimated from actual comparable sales, to determine the leasehold value. Mr. Creasman and Mr. Tenpenny, Mr. Creasman's supervisor, applied a 99-year lease term in their calculations.

Petitioners' primary challenge to the methodology used by the appraisers in this case is the argument that using a 99-year term in calculating the value of their leasehold interests is in violation of Tennessee Code Annotated § 67-5-605, and therefore is arbitrary. The statute, as already noted, requires that leasehold interests "*shall be valued by discounting to present value* the excess, if any, of fair market rent over actual and imputed rent for the leased premises, *for the projected term of the lease*, including renewal options." (Emphasis added). All of the permits expired by their express terms on December 31, 2008. None of the permits provided for a "renewal option," although the Forest Service was authorized by the permit, and in fact did, issue new 20-year permits to the Petitioners after their old permits expired. During the years 2003 through 2008, the term of each permit was clear and easily calculable from the express provisions of the permit, which was the controlling document reflecting the parties' intentions and agreement. On January 1, 2003, there remained six years on each permit, with that number decreasing by one each passing year. Mr. Tenpenny testified that the expiration date on the face of each permit did not factor into the appraisal analysis because of his understanding that the Forest Service had never turned down a renewal permit or let a permit lapse, and because "it looked like they [Petitioners] were purchasing those to have them for a period of time longer than 20 years."

_____

[8]Lynn Tenpenny, Mr. Creasman's supervisor, testified that a capitalization rate is a rate of return that justifies the amount of rent charged for a given property. Mr. Tenpenny stated that in determining a capitalization rate for an ordinary lease, "you take the net operating income and divide it by the sale price and that gives you the capitalization rate." The DPA employees used the "IRV formula," where Income equals Rate times Value, in valuing the Properties. The difficulty presented with this approach in this case was the fact that there was no actual "income" generated by the Properties because they were used for personal, non-commercial purposes.

Donald Osborne testified by deposition that he was designated by the state to testify as an officer or agent on behalf of the Tennessee Comptroller of the Treasury, Division of Property Assessments. Mr. Osborne stated that he was the supervisor of Mr. Tenpenny's supervisor at the DPA. Regarding the selection of a term length for a leasehold interest valuation, Mr. Osborne testified as follows:

> Q: I'm asking you if you are aware of a situation where a leasehold interest analysis and valuation was performed using a term for a piece of property as part of the calculation that is different than the term of the lease as provided in the lease? . . . .
> A: Not that I recollect.
> . . . .
> Q: Are you aware of any appraisals or valuations performed by the Division for the years 2003 through 2008 wherein the leasehold interest appraisal did not change year to year during that period?
> A: I have no personal knowledge of that being the case.

Mr. Osborne testified that in a typical leasehold analysis, the term of the lease declines every year, so that the present value of the leasehold interest becomes less every year. In the present case, however, because Polk County used a static 99-year term every year, there was effectively no reduction to present value as required by the statute. Mr. Osborne testified that "[i]t's the Division's policy that the leasehold valuation be considered for the duration of the lease and any options."

Mr. Osborne confirmed that the length of the lease term, or holding period, is an important factor in properly calculating the leasehold value:

> Q: If Mr. Tenpenny indicated that the permits have a 20-year term period and the permits, in fact, had less than a 10-year term period, is that a material misstatement in connection with a leasehold interest and valuation?
> A: The term of the holding period with regard to the valuation of the property is certainly important in the valuation of that leasehold value.
> Q: In fact, if he used the term different from the actual term of the permit, he would get a different valuation than if he had used the correct term, would he not?
> A: A different holding period will produce a different number, yes.
> Q: And that is why, for leases with specific terms, the valuation changes each year because the holding period is different as the term expires year to year?
> A: Typically, yes.
> . . . .

Q: If the 99-year term was incorrect, would that affect the leasehold value determined in Exhibit 16?
A: Yes, I would think so. Yes.
Q: Could it materially affect the leasehold value amount?
A: It would depend on what the holding period actually was. *If it was 10 years and not 99 years, it would be a dramatic impact on that leasehold value.* Yes.

(Emphasis added).

Polk County argues that in reality, the Forest Service has routinely reissued permits in the past and has only terminated one permit in an instance where a cabin burned and was not rebuilt. Polk County references the testimony of several Petitioners who stated that they were unaware of the Forest Service ever denying the re-issuance of a permit or the issuance of a new permit to the new purchaser of a lakeside cabin in the Cherokee National Forest. We are of the opinion, however, that to allow Polk County to arbitrarily select and apply a 99-year term to these permits would ignore the reality that the permits have an express, written, agreed-upon term. By their clear and unambiguous terms, the permits expired on December 31, 2008. The permits contain no guarantee or right of renewal. Further, the permits authorize the Forest Service to terminate a permit under certain circumstances, and to decline to reissue a permit following its expiration, in its discretion. There is no provision in the permit requiring the Forest Service to renew a permit after its expiration, and the speculation that the Forest Service would forever continue its apparent practice of frequently reissuing permits following expiration[9] does not justify the imposition of a perpetual 99-year term in the calculation of the leasehold value of the interest held by the permit holders for real estate tax purposes. This Court, in discussing the definition of the term "arbitrary," has recently observed that

> [a] decision unsupported by substantial and material evidence is arbitrary and capricious. *City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 315 (Tenn., 2007). Yet, a clear error of judgment can also render a decision arbitrary and capricious notwithstanding adequate evidentiary support. *Id.* at 316. A decision is arbitrary or capricious if it "is not based on any course of reasoning or exercise of judgment, or . . . disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." *Id.* (quoting *Jackson Mobilphone* [*Co. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d [106,] 110–11 [Tenn. Ct. App. 1993]).

---

[9]The record on appeal does not contain testimony from a U.S. Forest Service or Department of Agriculture official.

-14-

*City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. Ct. App. 2007).

Most significantly, Polk County's arbitrary selection and use of a static 99-year term violated the statute, which at the time required that "[l]easehold interests assessable under § 67-5-502 shall be valued by discounting to present value the excess, if any, of fair market rent over actual and imputed rent for the leased premises, for the projected term of the lease." Tenn. Code Ann. § 67-5-605. The use of the word "shall" in the statute "indicates that the legislature intended the requirements to be mandatory, not directory." *Myers*, 382 S.W.3d at 308; *see also Stubbs v. State*, 393 S.W.2d 150, 154 (Tenn. 1965) ("[W]hen the word 'shall' is used in constitutions or statutes it is ordinarily construed as being mandatory and not discretionary."). The use of the same holding period or lease term for each year means that Polk County's calculations did not discount to present value the estimated difference between actual rent and fair market rent for the lease's term. We affirm the judgment of the trial court that Polk County's use of a static 99-year term[10] was arbitrary and violated Tennessee Code Annotated 67-5-605. We hold that the tax assessor should have calculated the holding period under the express written provisions of the Term Special Use Permit agreement.

### V. Tax Credit for Alleged Payments by USDA to Polk County

In their original petition, Petitioners alleged that

Upon information and belief, the U.S. Department of Agriculture paid from 2003 to 2007, and continues to pay Polk County, amounts equal to twenty-five percent (25%) of the Term Special Use Permit annual permit fee received from Petitioners under the 25% Fund Act of May 23, 1908, to benefit schools and roads in Polk County.

The State Board of Equalization rejected Petitioners' argument that they were entitled to an offsetting credit for the amounts allegedly paid by the federal government under the cited act, codified at 16 U.S.C. § 500, which provides in pertinent part:

On and after May 23, 1908, an amount equal to the annual average of 25

---

[10]Mr. Creasman testified that the appraisers "r[a]n some new numbers based on a term of 25 years" instead of 99 years at some point in the valuation process; he was "not exactly sure" when. Based on this rather vague testimony, it is not entirely clear whether the tax assessor used a static 99-year term for every year at issue, or whether a static 25-year term was used for one or more years. Mr. Creasman testified that "running the new numbers" resulted in only a slight change in the valuations of the leasehold interests, and that the tax assessments did not change. Irrespective of whether the tax assessor applied a static 99-year term or a static 25-year term in some of his calculations, our analysis and holding that the actual term of the permits should be used remains unchanged.

percent of all amounts received for the applicable fiscal year and each of the preceding 6 fiscal years from each national forest shall be paid, at the end of such year, by the Secretary of the Treasury to the State or Territory in which such national forest is situated, to be expended as the State or Territorial legislature may prescribe for the benefit of the public schools and public roads of the county or counties in which such national forest is situated: Provided, That when any national forest is in more than one State or Territory or county the distributive share to each from the proceeds of such forest shall be proportional to its area therein.

The trial court reversed the decision of the Board of Equalization, ordering "that the Assessor void the taxes and is allowed to reassess according to the statute and allow a credit for the portion of the permit fee paid [by] the U.S. Government to Polk County." The trial court made no findings of fact and cited no legal authority in support of its conclusion on this issue. Polk County argues that 16 U.S.C. § 500 "has no relevance to the appraisal of the leasehold interest and there is no evidence that Polk County received any money from the United States Department of Agriculture."

The parties disagree on whether there is evidence in the record that the USDA paid Polk County under the federal statute during the years in question. Most of the references in the record to any payments made by the federal government to Polk County come in the form of questions posed by counsel to the witnesses. For instance, Mr. Tenpenny was asked whether there "[w]as any credit given for the fact that 25 percent of the annual permit fee is remitted to Polk County in your leasehold valuation analysis," and he responded, "no." Mr. Yates testified as follows on this point:

Q: And you are aware that 25 percent of the permit fee paid by the [Petitioners] . . . is remitted to Polk County under the 1921 [*sic*] Act for schools and roads, are you not?
A: I couldn't answer that. I'm not sure.
Q: Okay. You were at the previous hearing in this matter, right?
A: Yes.
Q: In front of Judge Norville. Do you recall your counsel indicating that he was aware that the payment was made, but that it was not segregated from the payments that the Forest Service makes for other lands and timber forest and that kind of stuff?
A: Yes, I remember.
Q: Do you recall that?
A: Yeah.
Q: So you don't specifically see a payment coming in just for these permits or

these leasehold interests of these pieces of property?

A: No, I don't.

Q: But you are aware that the Forest Service makes a payment under that Act?

A: Right.

Q: For 25 percent of permits, used permits issued by it?

A: I can't say where it comes from. I mean, there is a payment.

Q: Payment is made?

A: Yes.

The proof of payments to Polk County under 16 U.S.C. § 500 in the record is at most scant. More importantly, Petitioners have at no stage of the proceedings in this case referenced any legal authority supporting the proposition that they are entitled to offsetting tax credit by operation of 16 U.S.C. § 500. Simply stated, Petitioners have cited no statute, regulation, judicial opinion, or any other authority that mandates or allows a tax credit for the amount of money paid by the federal government to Polk County in this case. Moreover, in its order granting final judgment, the trial court made no finding that any of the five grounds provided in Tennessee Code Annotated § 4-5-322(h) allowing a reviewing court to reverse an administrative decision[11] were demonstrated. Our review of the record supports the conclusion that none of the enumerated grounds exists in this case. We therefore agree with Polk County's argument, and the finding of the Board of Equalization, that 16 U.S.C. § 500 has no relevance to the issue of valuation and assessment of the Petitioners' leasehold interests.

## VI. Conclusion

The judgment of the trial court that Polk County's use of a static 99-year term in evaluating and assessing Petitioners' leasehold interests for real estate tax purposes was arbitrary and violated Tennessee Code Annotated 67-5-605 is affirmed. The trial court's judgment requiring the Polk County Tax Assessor to allow a credit in the amount paid by the federal government under 16 U.S.C. § 500 to Polk County is reversed. Upon remand, the Polk County Tax Assessor shall reassess the leasehold interests for the years 2003 through 2008 in a manner consistent with this opinion. Costs on appeal are assessed one-half to the Appellants, the Polk County Tax Assessor and Polk County Trustee and their surety, and one-half to the Appellees, Petitioners Philip Dooly, John Higgins, Maryl Elliott, Anne Longley, Robert Robbins, Philip Newman, Amy Card-Lillios, Tommie Davis, Doug Swayne,

---

[11]As noted, the five statutory grounds are that "the administrative findings, inferences, conclusions or decisions are: (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority of the agency; (3) Made upon unlawful procedure; (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record." Tenn. Code Ann. § 4-5-322(h).

David Hairrell, Alice Hairrell, Kelly Feehrer, Michael Callaway, David Turpin, Burton Hall, George Lessig, Larry McDaris, William Torbett, Neal Officer, Karen Fisher, and Richard Fisher.

_____
THOMAS R. FRIERSON, II, JUDGE